Filed 8/14/20  P. v. Taylor CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

     Plaintiff and Respondent,

v.

DANIEL TAYLOR,

     Defendant and Appellant.

E072088

(Super.Ct.No. RIF1705016)

OPINION

APPEAL from the Superior Court of Riverside County.  William S. Lebov, Judge. (Retired judge of the Yolo Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed with directions.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Amanda E. Casillas, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant and appellant Daniel Taylor of four counts of robbery for his participation in separate robberies of a Sprint store (counts 4 & 5) and a Verizon store (counts 1 & 2) and one count of leading the police on a highspeed chase after the Verizon store heist (count 3). The jury found true firearm enhancement allegations for each robbery count, and defendant admitted he suffered prior convictions, including two strikes. The trial court dismissed one of defendant's strike priors in the interest of justice and sentenced him to state prison for 25 years four months.

On appeal, defendant argues his convictions on counts 4 and 5 must be reversed because his trial attorney rendered ineffective assistance of counsel by not objecting when the prosecutor introduced testimony of an investigating officer who identified defendant, from a video, as one of the Sprint store robbers. In addition, defendant contends the trial court erred during sentencing by imposing full one-year terms for the gun enhancements tied to subordinate counts (counts 2, 4, & 5), instead of one-third the term, and the court erred by imposing certain fines and fees without first determining his ability to pay, as mandated by *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

We conclude defendant's trial attorney provided effective assistance of counsel by not interposing a futile objection to properly admitted lay witness testimony identifying defendant as one of the robbers of the Sprint store and, *Dueñas* error during sentencing, if any, was harmless beyond a reasonable doubt. The People concede, and we agree, the trial court erred by imposing full one-year terms for the firearm enhancements tied to subordinate counts. We will modify the sentence on those enhancements and affirm the judgment as modified.

I.

FACTS AND PROCEDURAL BACKGROUND[1]

On the afternoon of October 19, 2017, A.R. was working as a sales associate at a Sprint store in Moreno Valley, when a man—later identified as Jamahd McCoy[2]—entered the store and asked about service. A.R. described McCoy as "5-7, skinny guy, young guy, African-American guy like me." McCoy said he would probably come back later and left the store. A.R. went into a locked back room, where his supervisor G.C. was performing an inventory count, then walked back to the front of the store. About a minute and a half later, McCoy ran back into the store, pulled out a semiautomatic handgun, and pointed it at A.R. McCoy said something about shooting A.R. and told him to open the back room. A.R. tried to open the back room door, but he was scared and had trouble entering the code on a keypad. McCoy said, "If you keep messing around, I'm going to shoot you."

When A.R. finally unlocked the door to the back room, he opened the door and said to G.C., "he's got a gun." McCoy pointed his gun at G.C. and said, "Get down" and "Don't look at me." A.R. and G.C. got down on the floor. Another African-American

_____

**1** Because defendant does not challenge his convictions for robbing the Verizon store (counts 1 & 2) or his conviction for leading the police on a highspeed chase after that robbery (count 3), we need not set forth the facts of those offenses, including the testimony of the sole witness called by the defense.

**2** McCoy pleaded guilty before trial and is not a party to this appeal.

man entered the store, walked into the back room, and kicked A.R.'s foot out of the way because it was holding the door open. When the door closed, McCoy and the other man said, "Just don't do anything stupid," and "Don't look at us and everything will be all right."[3] The second man had bags and ties in his hands, and the two men filled the bags with "83 or 85" phones. After taking the phones, the two men asked where the money was. Fearing she might get shot, G.C. gave them $400 from the cash registers. G.C. testified she did not recognize defendant as being the second man who entered the back room, and A.R. testified he did not see the second man's face. Video footage taken during the robbery of the Sprint store was played for the jury.

Investigator Sinclair of the Riverside County Sheriff's Department was assigned to investigate the Sprint store robbery and collected the surveillance video. He watched the video "dozens of times," "looking for any unique investigative options to pursue including clothing, weapons, identification of persons, . . . actions, mannerisms, vehicles, you name it." When defendant and another man were arrested on the day of the December 4, 2017 robbery of the Verizon store and the highspeed chase, Sinclair had the opportunity to see defendant in person. Sinclair described defendant as African-American, about six-foot-one-inch tall, and weighing over 250 pounds. He also testified defendant was born in December 1970, meaning he was almost 47 years old at the time of the Sprint store robbery. Sinclair instantly recognized defendant from the video.

---

[3] G.C. testified she saw McCoy, and she described him as African-American and "maybe like early 20s." She also described the second man as African-American and "[p]robably about the same age," but added, "[i]t was so fast," and "I didn't see him very well."

After seeing defendant in person, Sinclair reviewed the video again "and uniquely identified [defendant] by what he carried himself as, [how] he walked, his unique facial features, [and] his build." Defendant was wearing a hat and sunglasses during the robbery. Although the cameras did not capture defendant's face directly from the front, Sinclair testified the portion of the video showing defendant entering the inventory room captured "his profile, his unique chin line, and [the] lower part of his face was very clear once you do a frame by frame continuous analysis of it." Sinclair also testified the second man in the video had "a very upright and vertical walk" and swung his arms in front of him in a nontraditional way. Sinclair observed defendant walk the same way in person.

On cross-examination, Sinclair testified he did not take measurements of defendant's neck or note how long his arms were when comparing him to the second man depicted in the video. About a snapshot taken from the video, Sinclair testified, "I examined this angle, again dozens of times, trying to find unique things, perhaps tattoos, piercings, things that would be unique to an individual. I did not note any. I didn't measure any symmetry or measurements in any way." Sinclair testified DNA samples and fingerprints were collected from the store. Although the video showed the second man touch some surfaces, neither the DNA samples nor the fingerprints matched defendant.

The second man in the video was wearing a hat and sunglasses; McCoy wore nothing that covered his face. Nevertheless, on cross-examination, Sinclair testified he was more certain of his identification of defendant as the second man than he was about

5

his identification of McCoy as the first man. "I was more certain . . . based on the uniqueness and totality of what I reviewed and observed on each of them independently." Sinclair reiterated that, in part, he identified defendant from his unique profile. No two people have the same profile, Sinclair testified, although they might have a similar one. Sinclair took a photo of defendant's profile and compared it to the second man's profile, as depicted in the video. He provided all photos taken of defendant to the prosecutor, but he did not specifically state in his report that he had analyzed defendant's profile.

Sinclair acknowledged on cross-examination that A.R. and G.C. did not identify defendant as the second man, and he testified he did not show the photos taken of defendant to those witnesses or ask if they could identify defendant as the second man. He explained (about McCoy): "That is . . . not a standard I adopt to take photos of suspects to witnesses or victims of crime to, perhaps, alter their recollection or influence their recollection." When analyzing the video, Sinclair observed no unique tattoos, marks, or scars on the second man "that would have connected" defendant to the robbery. And when defendant's home was searched after the Verizon store robbery and highspeed chase, Sinclair did not find the clothing or hat worn by the second man in the video.

On redirect, Sinclair testified nothing was found at defendant's home because he had moved out, and the home "was completely empty." He also testified the second man's arms were "clear" (i.e., he had no tattoos, scars, etc.), "and you can see them through[out] the video." And when Sinclair met defendant in person, he had no tattoos or marks on his arms either.

The jury found defendant guilty of two counts of robbery for the Verizon store heist (Pen. Code, § 211, counts 1 & 2), one count of leading the police on a highspeed chase after the Verizon store robbery (Veh. Code, § 2800.2, count 3), and two counts of robbery for the Sprint store heist (Pen. Code, § 211, counts 4 & 5). The jury also found true sentencing enhancements for counts 1, 2, 4, and 5, that a principal in the robberies (McCoy) was armed with a handgun. (Pen. Code, § 12022, subd. (a)(1).) Defendant admitted he suffered a 1989 conviction for robbery (Pen. Code, § 211) and a 1994 conviction for assault with a deadly weapon (Pen. Code, § 245, subd. (a)(2)), both of which were serious felonies (Pen. Code, § 667, subd. (a)) and strike priors (Pen. Code, §§ 667, subds. (c), (e)(2)(A), 1170.12, subds. (c), (e)(2)(A)).

The trial court exercised its discretion to dismiss defendant's 1989 strike prior in the interest of justice. The court deemed count 1 to be the principal count, and sentenced defendant to state prison for the low term of two years, doubled under the three strikes law, for a term of four years. For counts 2, 4, and 5, the court sentenced defendant to one-third the middle term of three years, doubled under the three strikes law, for a total of six years to be served consecutively with the sentence on count 1. The court sentenced defendant to one-third the middle term of two years on count 3, doubled under the three strikes law, for a term of one year four months to be served consecutively with count 1. And the court sentenced defendant to the full term of one year for each firearm enhancement, for a total of four years, and sentenced defendant to five years for each prior conviction, for a total of 10 years, to run consecutively to the sentence on count 1. In all, the court sentenced defendant to a total state prison term of 25 years four months.

7

In addition, the trial court ordered defendant to pay a minimum $300 restitution fine (Pen. Code, § 1202.4, subd. (b)); a minimum $300 parole revocation restitution fine, stayed pending successful completion of parole (Pen. Code, § 1202.45, subd. (c)); a $40 court operations fee for each conviction, for a total of $200 (Pen. Code, § 1465.8, subd. (a)(1)); and a $30 criminal conviction assessment for each conviction, for a total of $150 (Gov. Code, § 70373).

Defendant timely appealed.

II.

DISCUSSION

A.    *Defendant's Trial Attorney Did Not Render Ineffective Assistance of Counsel by Failing to Object to Investigator Sinclair's Testimony.*

Defendant argues his trial attorney rendered ineffective assistance of counsel by not objecting to Investigator Sinclair's testimony identifying him as the second man depicted in the video of the Sprint store robbery. According to defendant, Sinclair's identification was improper lay witness testimony, and there could be no reasonable tactical reason for not objecting. We disagree.

1.    *Additional background.*

As defendant states, his trial attorney did not object to Sinclair's identification testimony as improper lay opinion.

During closing arguments, the prosecutor told the jury there was no question a robbery had taken place at the Sprint store. The only issue was identity. As she did in opening statements, defense counsel argued the only issue was "who did what, the

8

identity of the person, the suspects, who they are." "You as jurors have to look at the evidence and have to look at the testimony of the witnesses and determine, did anyone actually, in fact, identify [defendant]?" Counsel argued there was no witness identification of defendant, and the DNA and fingerprint evidence collected at the Sprint store did not match defendant either. "Instead, we have a videotape." She argued Sinclair's testimony—that he watched the video dozens of times and identified defendant as the second man—was insufficient to prove identity. "What he came up with was, one, the man walked upright. I would argue to you that most of us walk upright. That's what people do, they walk upright."

Defense counsel also argued the jury should not be convinced by Sinclair's testimony that he matched defendant's profile to the second man's profile as depicted in the video. Regarding Sinclair's testimony that no two people have the same profile, defense counsel argued, "We don't have evidence of that. We don't have the picture he compared it to, because it wasn't presented to you." She argued Sinclair's testimony was "not a scientific finding" the jury could test because, "even if you wanted to go back and say, what was it that Deputy Sinclair was looking at, let me see what he's talking about, you don't have that." Counsel argued it made no sense that the two people who were in the store and witnessed the robbery could not identify defendant yet Sinclair could do so simply by watching a blurry video. Finally, she told each juror, "You are the person that makes that decision. You're the person that determines credibility of that testimony. We don't have the evidence to support that testimony, and you should reject that testimony."

9

During deliberations, the jury requested G.C.'s and A.R.'s testimony be read back to them, and the jury also viewed the video of the robbery.

### 2. Applicable law.

To prevail on his claim of ineffective assistance of counsel, "defendant must show, among other things, that his 'counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.' [Citation.] In evaluating his claim, we 'defer[] to counsel's reasonable tactical decisions' and presume that 'counsel acted within the wide range of reasonable professional assistance.' [Citation.] Thus, defendant '"must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"'" (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.)

"'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' [Citation.] For this reason, claims of ineffective assistance of counsel 'are ordinarily best raised and reviewed on habeas corpus.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.) "'"Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence."'" (*People v. Rices* (2017) 4 Cal.5th 49, 80.)

"Where a sound legal basis exists for the admission of evidence, an attorney is not ineffective for failing to object to its introduction." (*People v. Seumanu* (2015)

61 Cal.4th 1293, 1313.) "Counsel is not required to proffer futile objections." (*People v. Anderson* (2001) 25 Cal.4th 543, 587.)

3.    *Analysis.*

Defendant's claim of error presupposes Sinclair's testimony was improper lay opinion, and that an objection would have been appropriate. Unlike an expert, a lay witness may only testify about matters of which he or she has personal knowledge. (Evid. Code, § 702.) A lay witness may offer an opinion only if it is based on his or her perception, and it is helpful to a clear understanding of their testimony. (Evid. Code, § 800; *People v. Jones* (2017) 3 Cal.5th 583, 602.) "'[T]he identity of a person is a proper subject of nonexpert opinion . . . .'" (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*); accord, *People v. Gonzales* (1968) 68 Cal.2d 467, 472; *People v. Jones* (1970) 10 Cal.App.3d 237, 247.) Admission of a lay opinion identifying a defendant as the perpetrator of a crime is reviewed for abuse of discretion. (*Leon*, at p. 600.)

"Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs. In [*People v. Perry* (1976) 60 Cal.App.3d 608], the defendant argued an identification had to be based on the officer's perception of a crime. (*Perry*, *supra*, 60 Cal.App.3d at p. 613.) The court disagreed, finding it proper for officers to predicate their opinion on 'contacts with defendant, their awareness of his physical characteristics on the day of the robbery, and their perception of the film taken of the events.' (*Ibid.*) The testimony was also helpful because the defendant had changed his appearance by shaving his mustache before trial. (*Ibid.*) Similarly, the court in [*People v. Mixon* (1982) 129 Cal.App.3d 118], upheld

11

identification of the defendant in a robbery surveillance photograph by officers who had numerous contacts with him and were unequivocal in their identification. (*Mixon*, *supra*, 129 Cal.App.3d at pp. 130-131; see also *People v. Ingle* (1986) 178 Cal.App.3d 505, 515 . . . [allowing similar testimony by robbery victim based on her observation of defendant during the crime].)" (*Leon*, *supra*, 61 Cal.4th at p. 601.)

In *Leon*, the prosecutor showed the jury a video taken of a robbery. (*Leon*, *supra*, 61 Cal.4th at p. 600.) Over the defendant's objection of improper lay testimony, a detective testified he was very familiar with the defendant's appearance because he saw the defendant when he was arrested the day after the robbery, he saw the defendant another 10 times after that, and he spent about two hours with him. (*Ibid*.) The detective identified the defendant as the robbery suspect because, at the time of his arrest, the defendant was wearing the same distinctive jacket as the suspect depicted in the video. (*Ibid*.)

On appeal, the defendant challenged admission of the detective's testimony as improper lay opinion. He sought to distinguish the decisions in *Perry* and *Mixon* on the ground the officers in those cases had contacts with the defendants *before* the crimes. The Supreme Court disagreed. "This is a distinction without a difference. It is undisputed [the detective] was familiar with defendant's appearance around the time of the crimes. Their contact began when defendant was arrested, one day after the [robbery captured in the video]. Questions about the extent of [the detective's] familiarity with defendant's appearance went to the weight, not the admissibility, of his testimony." (*Leon*, *supra*, 61 Cal.4th at p. 601.) Moreover, the court noted the jurors had been shown

the video, and they "could make up their own minds about whether the person shown was defendant." (*Ibid*.)

As noted, *ante*, Sinclair testified he watched the video of the Sprint store robbery dozens of times and observed the second man's unique profile and distinctive walk. When he met defendant in person two months later, Sinclair immediately recognized him based on those very same traits. Defendant argues Sinclair's testimony was inadmissible because he had no *prior* familiarity with defendant. But, the Supreme Court dismissed the same argument in *Leon* because it was undisputed the detective met and became familiar with the defendant's appearance "around the time of the crimes." (*Leon*, *supra*, 61 Cal.4th at p. 600.) So too here. Sinclair met defendant when he was arrested after the Verizon store robbery and highspeed chase, around two months after the Sprint store robbery. And, as in *Leon*, any question about Sinclair's familiarity with defendant's appearance went to the weight to be given his testimony by the jury, not to whether it was admissible or not. (*Ibid*.) Moreover, the jurors watched the video and could decide for themselves whether defendant was the second man. (*Ibid*.)

In addition, defendant argues that, unlike in *Leon*, Sinclair's testimony was not helpful to the jury because there was no evidence his appearance had changed significantly since the crime. He misreads *Leon*. There, witnesses who identified the defendant in lineups, which were conducted many months after the crime, testified the defendant was heavier, had shorter hair, and no longer had a mustache. (*Leon*, *supra*, 61 Cal.4th at p. 600.) Therefore, the Supreme Court said the detective's opinion, based on his "relevant personal knowledge" (i.e., his meeting the defendant a day after the

13

robbery and seeing him 10 times more for a total of 2 hours), "aided the jury." (*Ibid*.) But, the court did not hold that the detective's testimony was admissible *only* because the witnesses testified the defendant's appearance had changed significantly. Here, Sinclair's testimony was admissible and *did* aid the jury in determining whether defendant was the second man depicted in the video because the two witnesses who were in the store during the robbery were unable to identify defendant as one of the robbers.

Because there was a sound reason for the trial court to admit Sinclair's identification testimony, defendant's attorney did not provide deficient representation by failing to interpose a futile objection of improper lay witness testimony.

B. *The Sentences for Firearm Enhancements Related to the Subordinate Counts* (*Counts 2, 4, & 5*) *Must Be Modified.*

The parties agree the trial court should have only imposed one-third the term for the enhancements tied to counts 2, 4, and 5, the subordinate counts. We too agree and modify defendant's sentence appropriately.

When a defendant is convicted of more than one felony offense, the aggregate sentence is the sum of the principal and subordinate terms. (Pen. Code, § 1170.1, subd. (a).) The subordinate term for consecutive offenses consists of one-third the middle term, plus "one-third of the term imposed for any *specific enhancements* applicable to those subordinate offenses." (*Ibid*., italics added.) A one-year firearm enhancement under Penal Code section 12022 is such a "'specific enhancement.'" (Pen. Code, § 1170.11.) And, unlike the principal and subordinate terms, the term for an enhancement is not doubled under the three strikes law. (*People v. Sok* (2010)

14

181 Cal.App.4th 88, 93-94 ["[E]nhancements are added after the determination of the base term and are not doubled."].)

As noted, *ante*, the trial court imposed full one-year terms for the firearm enhancements tied to counts 2, 4, and 5. Because those were subordinate counts, the trial court erred. "A claim that a sentence is unauthorized may be raised for the first time on appeal, and is subject to correction whenever the error comes to the attention of the reviewing court." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1048, fn. 7.) We, therefore, modify the sentence imposed for the firearm enhancements on counts 2, 4, and 5 to correctly reflect one-third the term or four months each.

C. Dueñas *Error*, *if Any*, *Was Harmless Beyond a Reasonable Doubt.*

Last, relying on *Dueñas*, *supra*, 30 Cal.App.5th 1157, defendant contends the trial court erred by imposing a restitution fine, a court operations fee, and a criminal conviction assessment without first determining whether he had the present ability to pay them. In a nutshell, *Dueñas* held a sentencing court violated the due process rights of a defendant, who had committed her acts out of poverty, when it imposed certain mandatory fees and fines, which lacked a statutory exception, without first making a finding the unemployed defendant (who also suffered from cerebral palsy) had the ability to pay while she was on probation. (*Id*. at pp. 1168-1169.) The People contend *Dueñas* was wrongly decided and suggest a more appropriate analysis would be to decide whether defendant's restitution fine is excessive under the federal and state excessive fines clauses. In addition, the People contend defendant's nonpunitive court operations fee and criminal conviction assessment simply do not implicate due process concerns.

15

Whether *Dueñas* was correctly decided is currently pending before the Supreme Court,[4] and we need not wade into that thicket. *Dueñas* error in this case, if any, was harmless beyond a reasonable doubt. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1034-1035 [*Dueñas* error subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140 [same].) "[U]nlike the probationer defendant in *Dueñas*, it is entirely appropriate [on appeal] to consider the wages [a] defendant may earn in prison on the inability-to-pay issue. (See *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 . . . [ability to pay may include a defendant's prison wages]; [Pen. Code,] § 2085.5 [outlining how a restitution fine balance may be collected from prison wages].)" (*People v. Jenkins* (2019) 40 Cal.App.5th 30, 41.)

"Wages in California prisons currently range from $12 to $56 a month. (Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1); Cal. Dept. of Corrections and Rehabilitation, Operations Manual, ch. 5, art. 12, § 51120.6, pp. 354-355 (Jan. 1, 2019) . . . .) And half of any wages earned (along with half of any deposits made into his trust account) are deducted to pay any outstanding restitution fine. (Pen. Code, § 2085.5, subd. (a); Cal. Code Regs., tit. 15, § 3097, subd. (f).)" (*People v. Jones*, *supra*, 36 Cal.App.5th at

---

**4** The Supreme Court granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47 (review granted Nov. 13, 2019, S257844) to decide the following questions: "Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? If so, which party bears the burden of proof regarding defendant's inability to pay?" (*People v. Kopp* (Nov. 13, 2019, S257844) 2019 Cal. Lexis 8371.)

p. 1035.) Defendant was sentenced to state prison for more than 20 years. Although it will likely take him some time, defendant will have the opportunity during his lengthy prison sentence to pay his $200 court operations fee, his $150 criminal conviction assessment, and his $300 restitution fine through prison wages and gifts.[5] (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1077 ["While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments on these amounts from either prison wages or monetary gifts from family and friends during his lengthy prison sentence."]; *People v. Jones*, at p. 1035 ["Given that the restitution fine is $300 and the assessments are $70, Jones will have sufficient time to earn these amounts during his [six-year] sentence, even assuming Jones earns nothing more than the minimum."]; *People v. Johnson*, *supra*, 35 Cal.App.5th at p. 139 [finding error harmless beyond a reasonable doubt because "[t]he idea that [defendant] cannot afford to pay $370 while serving an eight-year prison sentence is unsustainable"].)

---

[5] In his interview with the probation department for its sentencing recommendation and report, defendant said he suffered from carpal tunnel syndrome in his wrists, which caused him extreme pain, and he had knee problems. Otherwise, defendant reported he was in fair physical health and good mental health. Defendant also informed the probation department that, before he was arrested, he was out of work but earned $2,000 a month doing side jobs, and he had been receiving temporary disability income benefits, but those benefits had been discontinued pending his application for permanent disability income. But there is nothing in the record to suggest defendant is completely disabled and unable to perform any work during his imprisonment.

III.

DISPOSITION

The sentences for the firearm enhancements for counts 2, 4, and 5 are modified to reflect the correct sentence of four months each.  The clerk of the superior court shall prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:


SLOUGH
J.


MENETREZ
J.


18